\UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 22-CR-242 (TSC) |
| CHRISTINE PRIOLA, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Christine Priola to 18 months' incarceration, which is in the middle of the agreed-upon guidelines range; 3 years of supervised release; $2,000 in restitution; and the mandatory $100 special assessment for each count of conviction.[1]

## I.    INTRODUCTION

The defendant, Christine Priola, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[2]

---

[1] The government will submit video exhibits to defense counsel and the Court via USAfx in advance of the sentencing hearing. The videos were taken by other rioters on the scene on January 6, 2021. Exhibits numbered X-X (*e.g.*, Ex. 2-2) are still photos taken from the video exhibits.

[2] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to

Priola, a former occupational therapist at a local school district, joined the front lines of the riot and entered the Capitol building soon after other rioters overcame the U.S. Capitol Police officers guarding the East Rotunda (Columbus) doors. Priola carried a large sign reading, "WE THE PEOPLE TAKE BACK OUR COUNTRY" on one side and "THE CHILDREN CRY OUT FOR JUSTICE" on the other side. Once in the building, Priola made her way to the Senate floor. While on the Senate floor, Priola spoke to an associate by telephone and encouraged that person to come inside either the Capitol building or the Senate Chamber, saying it was "now or never." Priola declined to be interviewed by law enforcement officers during the execution of a search warrant at her residence on January 9, 2021. Sometime before January 13, Priola deleted from her cellular telephone photos, videos, chats, and messages regarding her activities on and around January 6.

The government recommends that the Court sentence Priola to 18 months' incarceration, which is the middle of the stipulated and applicable Guidelines' range of 15-21 months. Such a sentence would reflect the gravity of Priola's conduct but also acknowledge her early admission of guilt.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Priola among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous

---

the United States Capitol building and grounds and certain costs borne by the United States Capitol Police."

weapons; they terrified congressional staff and others on the scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. As this Court explained, "[a] mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25.

As set forth in the PSR and the Statement of Offense incorporated into Priola's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows

of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-9; PSR ¶¶ 18-24.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). This Court has expressed its agreement with that observation. "This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system." *United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14). Other members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against

4

morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25.

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott,

Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

**B.      Priola's Role in the January 6, 2021 Attack on the Capitol**

*1.  Arrival at the Capitol*

On or about January 6, 2021, Priola traveled by chartered bus from her residence in Willoughby, Ohio, to Washington, D.C., arriving in Washington on January 6, 2021. Priola then made her way to the U.S. Capitol grounds. She was carrying a large sign reading, "WE THE PEOPLE TAKE BACK OUR COUNTRY" on one side and "THE CHILDREN CRY OUT FOR JUSTICE" on the other side.

*2.  Priola Joins the Front Lines of the Rioters and Enters the Capitol Building*

Once at the Capitol grounds, Priola joined a crowd of people lined up behind the security barriers and facing U.S. Capitol Police officers, some of whom were outfitted in riot gear. People in the crowd were chanting "Stop the steal." Ex. 1. At some point, Priola entered the restricted area on the east side of the building, joined the front lines of the riot, and climbed the steps to the Capitol building. *See* Exs. 2-1, 2-2, and 3-1.

*Exhibit 2-1 (Priola in the Crowd Outside)*



*Exhibit 2-2 (Priola in the Crowd Outside the Rotunda Doors)*



*Exhibit 3-1 (Priola's Sign in the Crowd Outside the Rotunda Doors)*



Priola was among a crowd of people, some of whom were yelling, "Stop the Steal" and "Who's our President? Trump!", among other things. *See* Ex. 2. People in the crowd also were complaining of tear gas and rubbing their irritated eyes. *See* Ex. 2-3.

*Exhibit 2-3 (Tear Gassed Protester Outside the Rotunda Doors)*



Priola ultimately entered the Capitol building, at approximately 2:49 p.m., by way of the East Rotunda (Columbus) doors. *See* Exs. 4-1, 5-1, and 5-2. She did so soon—within minutes—after the first protesters overcame U.S. Capitol Police officers guarding that entrance to the building, *see* Exs. 4 and 5, and about 20 minutes after members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers.

10

*Exhibit 4-1 (Priola's Sign in the Crowd Outside Through Open Rotunda Doors)*



***Exhibit 5-1 (Priola's Sign in the Crowd After She Entered the Building)***



While inside the building, Priola was captured in a video taken by another person and falsely told that that person that her name was "Christine Blays" and said, "I have no more memory on my phone." Ex. 3 at 2:27. She yelled as she walked down the East Corridor. Ex. 3 at 2:12-2:45. She also posed for a picture with her sign. *See* Image No. 1 below.

12

*Image No. 1: Priola in the East Corridor*



Priola held her sign up to a window (from the inside) and knocked on the glass and gestured to the crowd below. *See* Ex. 7-1.

*Ex. 7-1: Priola Holding Sign at Window*



### 3.   Priola Enters the Senate Chamber

While inside the Capitol, Priola made her way to the Senate Chamber and entered the

restricted floor area of the Chamber. Priola remained on the Senate floor for approximately 10

minutes. While there, Priola continued to carry and display her sign. She also made a number of telephone calls, including one to an associate who was outside the building. Priola told that person that she believed she was in the Senate and that he needed to come inside, urging him, "Everybody has to get in here now. This is now or never." Ex. 8 at 0:10-0:14.

Priola took photographs and videos while she was on the Senate floor using her cell phone. PSR at ¶ 14; *see* Exs. 8-1 and 8-2. As can be seen in Image No. 2 below, Priola stood next to the dais of the Senate in the well of the Senate Chamber carrying her sign.

*Ex. 8-1: Priola Talking on Her Cell Phone on the Senate Floor*



*Image No. 2: Priola Taking a Photo on the Senate Floor*



### 4. Priola's Actions After Leaving the Building

Priola was inside the U.S. Capitol for approximately 30 minutes, exiting the building at about 3:09 p.m. After leaving the building and rejoining her traveling companions, Priola told another associate that she had been pepper sprayed. This statement is consistent with the video evidence described above.

At the time of the Capitol riots, Priola was employed with the Cleveland Metropolitan School District (CMSD). She resigned from her position with the CMSD in a letter dated January 7, 2021. PSR at ¶ 15.

### 5. Destruction of Evidence

Sometime between January 6 and January 12, 2021, Priola deleted from her cellular telephone data for photos, videos, chats, and messages from approximately January 4 through January 7, 2021. PSR at ¶ 14.

### III.    THE CHARGES AND PLEA AGREEMENT

On January 13, 2021, Priola was charged by criminal complaint with Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(A) and (D); and Parading Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(F).

On July 13, 2022, Priola pled guilty to a one-count information charging her with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2).

### IV.    STATUTORY PENALTIES

Priola now faces sentencing on Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2). As noted by the plea agreement and the U.S. Probation Office, Priola faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The parties have stipulated to the applicable Guidelines calculations as follows:

<u>Count Two: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[3] | <u>+3</u> |
| | **Total** | **17** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-3</u> |
| **Total Adjusted Offense Level:** | | **14** |

*See* Plea Agreement at ¶ 5(A).[4]

The U.S. Probation Office calculated Priola's criminal history as category I, which the government does not dispute. PSR ¶ 32. Accordingly, based on the parties' calculation of Priola's total adjusted offense level, after acceptance of responsibility, at 14, Priola's Guidelines range is 15 to 21 months' imprisonment. Priola's plea agreement contains an agreed-upon Guidelines range calculation that mirrors these calculations.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to the advisory Sentencing Guidelines, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the

---

[3] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Priola admitted that she corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[4] Based on the facts and circumstances of Priola's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 15-21 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Priola's individual conduct and in determining a fair and just sentence, this Court should look to a number of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4)

the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

To be clear, had Priola personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Priola's part Priola is therefore not a mitigating factor in this case.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration. Priola was one of a small number of rioters to reach the Senate Chamber Floor, and she encouraged at least one other person to enter the Capitol, if not join her on the Senate Floor. Further, as she has admitted, Priola deleted potential evidence of her crimes— data for photos, videos, chats, and messages from approximately January 4 through 7, 2021. She also failed to demonstrate any remorse or contrition in the days and weeks following the attack. The seriousness of this offense including Priola's entry into the U.S. Capitol during the initial breach, demonstration on the Senate Chamber Floor, and deletion of potential evidence, demands a substantial sentence of imprisonment.

### B.  Priola's History and Characteristics

Priola is a former licensed occupational therapist who earned a Master of Science in Occupational Therapy. PSR at ¶ 51. She has no criminal history. *Id*. at ¶¶ 30-36.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Priola's criminal conduct, corruptly obstructing of an official proceeding, is the epitome of disrespect for the law. When Priola entered the Capitol grounds and the Capitol itself, it was abundantly clear to her that lawmakers and the police officers who tried to protect them were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.      The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the

---

[6] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a significant term of incarceration. Although Priola may express remorse and contrition at sentencing, these expressions should be viewed with caution as she exhibited no such remorse in the days after January 6, 2021. At this Court has pointed out, "The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions." *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. <u>See</u> 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and

fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Priola and others like her committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, only a few Capitol Riot defendants who reached the Senate Chamber have been sentenced for a violation of *only* 18 U.S.C. § 1512(c)(2). In *United States v. Paul Hodgkins*, 21-cr-118-RDM, Hodgkins unlawfully entered the U.S. Capitol about 50 minutes after it was first breached and made it to the Senate Floor with a Trump flag. Hodgkins pled guilty in June 2021 and was the first defendant to be sentenced for a violation of Section 1512(c)(2), having taken very early responsibility for his actions. He neither committed nor incited violence on January 6. Before sentencing, Hodgkins contributed more than 100 hours of community service since January 2021. The United States requested 18 months' imprisonment, and Judge Moss imposed a sentenced of 8 months' imprisonment.

In *United States v. Jacob Chansley*, 21-cr-003-RCL, Chanlsey, a Qanon shaman, made himself the face of the January 6 attack. Chansley climbed a tower on the way into the Capitol, entered Upper West Terrace among first 30 rioters, challenged police officers who directed rioters to leave, used a bullhorn, entered Senate Chamber floor, said former Vice President Pence was a traitor, left note on Senate dais, and gave tv interviews. Chansley's sentencing guidelines range was 41-51 months, and Judge Lamberth sentenced Chansley to 41 months' imprisonment for his

violation of Section 1512(c)(2).

In *United States v. Christian Secor*, 21-cr-157-TNM, Judge McFadden sentenced Secor to 42 months' imprisonment for aiding and abetting the obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2. Secor entered the Capitol building during the breach, reached the floor of the Senate Chamber, and sat in the chair where the Vice President would have been presiding if he had not been evacuated during the riot. Secor was part of a group that pushed through a doorway that was blocked by at least three police officers. The group successfully entered the doorway, shoving Capitol Police officers aside and trapping some of them between the doors and the crowd. Secor is president of the "America First Bruins," openly supports noted Holocaust denier Nick Fuentes, and has made statements online that are anti-Semitic and support fascism and nationalism, as well as the 2017 rally in Charlottesville, Virginia. Secor did not show any remorse. Like Priola, Secor did not have any criminal record, nor did he injure anyone or damage property. Secor's guidelines range was 12-18 months.

*United States v. Michetti*, 21-cr-232-CRC is another case involving a guilty plea to a violation of § 1512(c)(2) only. Michetti's social media posts and the texts he sent to his former girlfriend while in the Capitol clearly show his intent was to stop the certification of the election. Michetti saw rioters fighting officers outside and saw tear gas being deployed to prevent the mob from attacking the officers and the building.

Michetti never made it to the Senate Chamber. He tried to get into the Senate with the mob in the Old Senate Chamber hallway, pinched an officer's sleeve in anger while other rioters were attacking the officers there, and incited others to fight with the officers. Michetti left the building after 45 minutes inside. Michetti was the sole supporter of his 4-year-old daughter, had no criminal

history, and took positive steps after January 6 by going to anger management classes and going back to church. The United States requested 18 months' imprisonment, and Judge Cooper sentenced Michetti to 9 months' imprisonment in September 2022.

Unlike Hodgkins, Priola is not one of the first Capitol Siege defendants to plead guilty. Like Chansley and Secor, Priola entered the Senate Chamber and was on the Senate Floor, even approaching the dais to take a photo (see Image No. 1). Unlike Michetti, Priola did reach the Senate Chamber Floor. Unlike both Hodgkins and Michetti, Priola deleted potential evidence from her cell phone, and the government is not aware of any rehabilitative steps Priola has taken since her arrest. Accordingly, a sentence of 18 months' imprisonment in this case would not constitute an unwarranted sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[7] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties have agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Priola must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Priola played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Priola's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 18 months, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, and the mandatory $100 special assessment for the count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:     */s/Jolie F. Zimmerman*
        Jolie F. Zimmerman
        Assistant United States Attorney
        D.C. Bar No. 465110
        United States Attorney's Office for the District of
         Columbia
        601 D Street, N.W.
        Washington, DC 20530
        (202) 252-7220
        Jolie.Zimmerman@usdoj.gov