UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case No. 22-CR-00242-001 |
| CHRISTINE PRIOLA, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, CHRISTINE PRIOLA, through her attorney, Charles E.
Langmack, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C.
Section 3553(a), respectfully submits this memorandum to aid the Court at
sentencing and hereby notifies the Court that she has received and reviewed the
Presentence Report ("PSR") prepared in this case.  After carefully reviewing the
PSR with Ms. Priola, there are no additional objections.  For the reasons set forth
herein, Ms. Priola requests a downward variance(s) pursuant to Section 3553(a)
and from the applicable Sentencing Guidelines Range, and as required by
applicable law and  in support says as follows:

1.      Her lack of need for incarceration,

2.      Her non-destructive and non-violent behavior that day both outside

and inside the Capitol building, and

3.      Her ongoing  efforts to rehabilitate before sentencing.

Ms. Priola comes before the Court having plead guilty to the lone count of

1

the Information filed charging her with a violation of Title 18 U.S.C. §1512(c)(2),

Obstruction of an Official Proceeding and Aiding and Abetting.  A minimum

sentence is a reasonable sentence that is "sufficient, but not greater than necessary"

to address the sentencing factors and goals set forth in Title 18 U.S.C. § 3553(a).

Under the facts of this case, such a sentence will protect the public, provide just

punishment, and afford adequate deterrence.

At this juncture, the government has assumed a conclusion that is not

accurate. That assumption is that Ms. Priola was intent on gaining access to the

Senate chamber while she was inside the United States Capitol building and that

this was her purpose all along.  While the pre-sentence report states that she made

her way to the Senate Chamber, it implies that she had the intention of going there

purposely.  Ms. Priola didn't have the faintest idea of how to get to the Senate

Chamber and only happened on it by chance.  This is not meant to excuse, but

merely to explain the way it happened.  Ms. Priola's sole intent was to protest and

not to personally confront the legislative body. There were many improper and

illegal acts committed that day, including by Ms. Priola, but to not look at what she

did personally, separate from the other people present that day, does her an

injustice.

## 1. **BACKGROUND**

Ms. Priola entered a plea shortly after the government extended an offer and she has complied with all her conditions of release.  She has expressed remorse about her presence at the Capitol. She was cooperative when arrested. She engaged in no violence or property destruction during her brief time at the Capitol. She lost her job as well as many job opportunities. Although her conduct was ill informed and unlawful, it was neither aggressive nor hateful. Every communication she had with police officers that day was positive. None of them asked her to leave.  Although the situation was chaotic as the Court can see from the videos, the door Ms. Priola entered on the Eastern side of the Rotunda was much less violent. The chaos and events from that day clearly clouded her judgment, as it did to many people, unfortunately.

After the presidential election, Donald Trump (hereinafter "Trump") and his inner circle began spreading the word that the election was "stolen" from him by Democrats and others.  https://www.washingtonpost.com/politics/trump-election-voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html. Claims were made on media sources, as well as by the President himself, that the election system had been corrupted and that the integrity of the election should be questioned.

She entered through the East Rotunda doors after a crowd of others. She did not suit up for combat. She did not obscure her face. She was not armed with anything other than a sign and a phone. She wore street clothes. She committed no violent actions during her time inside and outside the Capitol. She did not destroy or steal anything. Her desire was to protest peacefully.

Ms. Priola has cooperated with law enforcement every step of the way during this process by giving them access to her electronic items as well as her social media accounts.

She now stands before the Court again, remorseful of her actions, and asks this Court to exercise grace and compassion in the sentence the Court must give.

## II. LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense. Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in

4

the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets

forth the factors that the Court must consider in fulfilling this provision:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;
2. The need for the sentence imposed;
3. The kinds of sentences available;
4. The kinds of sentence and the sentencing range…;
5. Any pertinent policy statements issued by the Sentencing Commission;
6. The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7. The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

### III. Sentencing under *Booker*

In *United States v. Booker*, 125 S. Ct. 738, 756 (2005), the Supreme Court,

reaffirming its holding *Apprendi v. New Jersey*, 530 U.S. 466(2000), concluded

that the provisions of the Federal Sentencing Reform Act of 1984 were not to be

applied as though they were mandatory, essentially making the guidelines

advisory. *Id*. At 757.  Therefore, instead of being bound by the Sentencing

Guidelines, the Sentencing Reform Act, as being revised by *Booker*:

[R]equires a sentencing Court to consider Guidelines ranges, see U.S.C.A.

3553(a)(4)(Supp. 2004), but it permits the Court to tailor the sentence in light of

other statutory concern, as well.  See 3553(a).

*Booker*, 125 S. Ct. at 757.

Therefore, under *Booker*, sentencing Courts must treat the sentencing

guidelines as just one of several sentencing factors that are otherwise set forth in

18 U.S.C. 3553(a).  The primary purpose in Section 3553(a) is for sentencing

courts to impose a sentence sufficient, but not greater than necessary, to comply

with the purposes set forth in paragraph 2 of the section.

## IV.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but

not greater than necessary" in light of the factors identified in §3553(a).    *United*

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4ᵗʰ Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & circumstances of the Offense & the History and Characteristics of Ms. Priola

First, the defense is not aware of any evidence that defendant's entry into the

Capitol was violent in any way.  Second, she did not engage with others while

walking in the Capitol. She was alone.  There was a statement that she provided a

false name to someone filming her, but that was a reaction to giving her name to a

male she didn't know, not an act of stealth or deception.  Third, there is no

evidence that she engaged in any violence or questionable conduct towards law

enforcement.  Although the government argues that Ms. Priola entered the Capitol

by pushing her way through the Rotunda doors there is no evidence that she in fact

pushed anything.  There were a lot of people trying to move through a small

doorway and the crowd behind was pushing to the point that there was no other

way to go but forward.  This is not to say that the intention wasn't to enter, but merely to point out the manner in which she, and many others, entered.  Fourth, the defense is not aware of any evidence that she destroyed or stole any property from the Capitol. Fifth, based on the Government's investigation, it appears that she remained in the Capitol building for a limited period of time.  Finally, she cooperated with police when she was arrested. She gave them all her social media information.[1]

The government must concede that she committed no violent acts and destroyed no property. Her actions within the Capitol have been tracked on the CCTV and open-source video footage and this demonstrates that while unlawfully present in the Capitol with no excuse, she did not destroy property, steal property or commit violent acts.   She entered and exited through doors and when she spoke to police officers, it was non-confrontational and respectful. She never forced her way past police.

This has been a long road for Ms. Priola and her family.  Her relationships with many friends and family are strained because of her actions.  She pled guilty at an early stage in the proceedings thus saving valuable judicial resources. It is of utmost importance to Ms. Priola that this Court understand that she is incredibly remorseful for her actions on January 6, 2021. None of her actions will be erased

---

[1] Like many J6 defendants, Ms. Priola was barred from most if not all social media platforms.

from the internet. It's there forever.   She has gotten threatening letters from strangers that have found her through the internet.   She has fully accepted responsibility for her bad judgement in entering the Capitol building by pleading guilty. Her personal character and reputation will forever be tarnished.   Still, she has hope that she can continue to serve his community.   She had to resign her position with the Cleveland School district and has been searching for a full-time job ever since.   She is currently trying to learn stenography, with thoughts on being a Court reporter.   This education is ongoing.

Ms. Priola does not seek to minimize the harm caused by her behavior by the explanations in this sentencing memorandum. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that she did no harm, intended no harm, and regrets that she was even there.   She has the support of her family and friends.   Her post arrest behavior shows that she is capable of being a very productive citizen and the Court can rely on that as a basis to sentence her minimally, considering the 3553 factors.

**B. Need for the Sentence imposed**

1. **General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct**

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.   The public will be

adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved.[2] Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to do his work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable on January 6th will not encourage respect for the law or promote just punishment, but are likely to be counterproductive, and labeled as political posturing. A minimum sentence does constitute punishment. She has been on pretrial release since her arrest with many restrictions. The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

**2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant**

---

[2] The deterrence factor here is magnified by the J6 hearing ongoing in Congress, the daily reports of other defendants being sentenced or in trial, and the constant barrage of talk show hosts discussing J6 in general.

Her likelihood of recidivism is very low. She has expressed genuine remorse and contrition and accepted the first plea offer tendered with no hesitation. Her acceptance of responsibility was complete and without reservation.   She met with the FBI. She was honest. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id.*; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given her age and other issues consistent

10

with what is mentioned above, the likelihood that she would ever re-offend is virtually non-existent. As her Pre-Sentence Report shows, she has never had any negative interactions with law enforcement. This was an isolated incident that she can assure this Court, will never occur again. Ms. Priola respectfully requests that the Court impose a lesser sentence in this case in light of her sincere and complete remorse, her non-violent conduct at the Capitol, her early and consistent acceptance of responsibility, and the lack of a need to further deter her.

### C.  The kinds of sentences available

The Sentencing Guidelines are only a guide for the Court. The PSR sets out the kinds of sentences available to the Court.

### D. The need to avoid unwarranted sentence disparities

If this Court were to follow the Guidelines given by the Prosecution, it would create an unwanted sentencing disparity compared to similar cases that have already gone to sentencing in this Court. The following Case is where a similar person committed the same act of mere presence in the Senate Chamber. In *United States v. Paul Allard Hodgkins*, 22-cr-00188(RDM)(Sentenced to Eight (8) months in Prison), Mr. Hodgkins did just about exactly what Ms. Priola did. They both entered through the East Rotunda door, alone, and walked through the hallways and found themselves inside the Senate chamber by mere luck, or misfortune as it is in this case. Neither accosted anyone nor argued with law enforcement. Neither

11

stole or damaged anything while they were inside.  As a matter of fact, the mere entrance into the Senate Chamber is the basis for the felony charge in this case. Had either of them stopped at the doorway and turned around, their fates would have been completely different.  If that were the case, they would have been charged with misdemeanors, as Ms. Priola was initially.  The likely outcome there would not have been a lengthy prison term.

The directives of *Booker* and 3553(a) make clear that Courts can no longer uncritically apply the guidelines.  Such an approach would be inconsistent with the holdings of the merits majority in *Booker*, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in Booker, directing courts to consider all of the 3553(a) factors, many of which the guidelines either reject or ignore.  *United States v. Ranum*, 353 F. Supp. 2d 984,985-86 (E.D. Wisc. Jan. 19, 2005) (Adelman, J.).  As another district court Judge had correctly observed, any approach which automatically gives heavy weight to the guideline range comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*. *United States v. Jaber*, F. Supp. 2d, 2005 WL 605787 4(D. Mass. March 16, 2005)(Gertner, J.), See also *United States v. Ameline*, 400 F.3d 646,655-56 (9th Cir. Feb. 9, 2005) (advisory guideline range is only one of many factors that a sentencing Judge must consider in determining an appropriate individualized sentence) *rh gen banc granted*, 401 F.3d 1007 (9th Cir. 2550).

Justice Scalia explains the point well in his dissent from Booker's remedial
holding:

> Thus, logic compels the conclusion that the sentencing Judge, after
> considering the recited factors (including guidelines), has full discretion, as full as
> what he possessed before the Act was passed, to sentence anywhere within the
> statutory range.  If the majority thought otherwise if it thought the Guidelines not
> only had to be considered (as the amputated statute requires) but had generally to
> be followed, its opinion would surely say so.  *Booker*, 125 S. Ct. at 791 (Scalia, J.,
> dissenting in part).

In sum, in every case a sentencing court must now consider all of the
3553(a) factors, not just the guidelines, in determining a sentence that is sufficient
but not greater than necessary to meet the goals of sentencing.  And where the
guidelines conflict with other sentencing factors set forth in 3553(a), these
statutory sentencing factors should generally trump the guidelines.  *See United
States v. Denardi*, 892 F.2d 269,276-77 (3ʳᵈ Cir. 1989) (Becker, J. concurring in
part, dissenting in part) (arguing that since 3553(a) requires a sentence be no
greater than necessary to meet four purposes of sentencing, imposition of a
sentence be no greater than necessary to meet those purposes violates statute and is
reversible, even if within guideline range).

**A variance under Section 3553(a)(1) is Warranted Utilizing the Factors under U.S.S.G. Section 3B1.2 and also  U.S.S.G. Section 2D1.1 (b)(18)**

Under Section 3553(a)(1) (the nature and circumstances of the offense), the Court may consider a variance if the Court considers that Ms. Priola's participation in the January 6, 2021 incident was minimal.

All you have to do is watch the many videos of that day to see that there were so many people involved in that riot/protest to realize that a lone person that had nothing to do with organizing, planning, directing or leading, had an extremely small role that day, yet admittedly was part of the confusion that caused the riot. Ms. Priola was not involved in any violence against law enforcement or property damage in the Capitol.  Even breaking it down to people that have been charged with a crime, she played no role of importance that day.  If Ms. Priola had not been there at all, there wouldn't be one change in what transpired.  It would be as if you took a random lone person out of a crowd and looked for what difference it made. The Court should respectfully consider a variance utilizing the factors under U.S.S.G. Section 3B1.2 of what would normally be a four (4) level reduction for a defendant being found to be a minimal participant in the events concerning what transpired on January 6, 2021 in accordance with 3553(a)(1).  These facts are not in dispute.

## V. CONCLUSION

Considering all the applicable factors the Court will consider, Ms. Priola respectfully moves this court to consider a downward variance and impose a minimum sentence under 15 months  and a short term of probation.   This sentence should be "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Ms. Priola as an individual and account for her unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

By: _____

Charles E. Langmack
Ohio Bar# 0092470
38106 Third Street
Willoughby, Ohio 44094
Phone: 440-497-5068
langmacklaw@gmail.com

CERTIFICATE OF SERVICE

I hereby certify on the 21st day of October 2022, a copy of same was delivered to the parties of record, by email, pursuant to the Covid standing order and the rules of the Clerk of Court.

Charles E. Langmack