```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


   UNITED STATES OF AMERICA,      .
                                  .
              Plaintiff,          .  CR No. 22-0242 (TSC)
                                  .
        v.                        .
                                  .
   CHRISTINE PRIOLA,              .  Washington, D.C.
                                  .  Friday, October 28, 2022
              Defendant.          .  10:06 a.m.
   . . . . . . . . . . . . . . .  .
```

```
                    TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE TANYA S. CHUTKAN
                  UNITED STATES DISTRICT JUDGE



       APPEARANCES:

   For the Government:           JOLE ZIMMERMAN, AUSA
                                 U.S. Attorney's Office
                                 601 D Street NW
                                 Washington, DC 20530
                                 (202) 252-7566


   For Defendant:               CHARLES E LANGMACK II, ESQ
                                 Langmack Law
                                 38106 Third Street
                                 Willoughby, OH 44094
                                 (440) 497-5068

   Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                                 U.S. Courthouse, Room 4704-A
                                 333 Constitution Avenue NW
                                 Washington, DC 20001
                                 (202) 354-3186
```

```
   Proceedings reported by stenotype shorthand.
   Transcript produced by computer-aided transcription.
```

1          P R O C E E D I N G S

2          THE DEPUTY CLERK:  Your Honor, we have criminal

3    action 22-242, United States of America versus Christine

4    Priola.  We have Ms. Jolie Zimmerman representing the

5    government, Mr. Charles Langmack III representing the

6    defendant, and we also have Ms. Aidee Gavito representing

7    Probation, and all parties are appearing in person.

8          THE COURT:  All right.  Good morning, everyone.

9    Good morning, Ms. Priola.

10         All right.  We are here for sentencing in this case.

11         Is the public line on?

12         THE DEPUTY CLERK:  Yes, it is.

13         THE COURT:  All right.

14      As a reminder to anyone who's calling in, it is strictly

15    prohibited by federal and local rules from recording,

16    broadcasting, or transmitting any portion of this hearing.

17    Now, we are here for the sentencing of Ms. Priola who has

18    plead guilty to obstruction of a official proceeding in

19    violation of 18 U.S.C. §1512(c)(2).

20      In preparation for this sentencing, I have received and

21    reviewed the presentence report and the sentencing recommendation

22    from the probation department and the following documents that

23    were submitted by counsel in advance of the hearing:  the plea

24    agreement signed by Ms. Priola, sentencing memoranda from the

25    government and from counsel for Ms. Priola, a letter from

1    Ms. Priola, and three letters of support from family members:

2    Emma Priola, Mary Lou Paul, and Barbara Krych-Dray.

3        I received all those materials.  Is there anything I'm

4    missing that I haven't mentioned, Ms. Zimmerman?

5            MS. ZIMMERMAN:  Yes, Your Honor.  So the government had

6    seven video exhibits.

7            THE COURT:  Yes.

8            MS. ZIMMERMAN:  Unfortunately, we were not able to get

9    them to the Court.  I don't believe the Court has had a chance

10   to review those.

11           THE COURT:  My understanding is that you seek to play

12   them in open court?

13           MS. ZIMMERMAN:  With the Court's --

14           THE COURT:  Yes.  Yes.

15           MS. ZIMMERMAN:  -- blessing.

16           THE COURT:  I do want to see them.  So that's fine.

17   That makes sense.  That way I don't have to watch them twice.

18   So yes, that's fine.

19       And do you have any objection, Mr. Langmack, the playing of

20   those video exhibits?

21           MR. LANGMACK:  Well, we would have an objection to

22   having them played.  Her role in that is pretty insignificant.

23   She had played small snippets in those, but overall --

24           THE COURT:  What's your objection based on?

25           MR. LANGMACK:  I guess --

1          THE COURT:  The fact that it's not nice to see?

2          MR. LANGMACK:  No.  That's not it as all.  We have no

3  formal objection.  It's just her role in those ten minutes are

4  about three minutes in there.  Just merely for efficiency's

5  sake, but --

6          THE COURT:  I understand.  That's fine.  I understand

7  the total running time is about ten minutes; and I think it's

8  important to gain context, and it's the best evidence of what

9  actually was taking place and the circumstances under which

10  Ms. Priola was acting when she committed these offenses.  So

11  I will allow the --

12     You want to play that as part of your allocution,

13  Ms. Zimmerman?

14          MS. ZIMMERMAN:  Yes, Your Honor.

15          THE COURT:  Okay.  That's fine.

16     All right.  With regard to the presentence report, I know

17  you said, Mr. Langmack, in your sentencing memo, that you had

18  resolved or -- I don't remember if you said you had no

19  objections or that any objections had been resolved, but I

20  do this in open court anyway.  The final presentence report

21  and sentencing recommendation were filed on October 18th of

22  this year.

23     Ms. Zimmerman, is there any objection to any of the factual

24  determinations as set forth in the presentence report?

25          MS. ZIMMERMAN:  No, Your Honor.

1    THE COURT:  All right.  Are you expecting an

2    evidentiary hearing other than playing the video exhibits?

3    MS. ZIMMERMAN:  No, Your Honor.

4    THE COURT:  Okay.  And, Ms. Priola, are you satisfied

5    with the services of your attorney in this case?

6    THE DEFENDANT:  Yes.

7    THE COURT:  Do you feel you've had enough time to talk

8    with him about the probation department's presentence report

9    and the papers that were filed by the government in connection

10   with the sentencing?

11   THE DEFENDANT:  Yes.

12   THE COURT:  Okay.  Mr. Langmack, have you and

13   Ms. Priola read and discussed the presentence report?

14   MR. LANGMACK:  Yes, we have, Your Honor.

15   THE COURT:  And are there any disputed issues of fact?

16   That is, does Ms. Priola have any objection to any of the

17   factual statements set forth in the presentence report?

18   MR. LANGMACK:  No, Your Honor.

19   THE COURT:  All right.  Hearing no objection from

20   either side, I will accept the factual recitation in the

21   presentence report regarding the circumstances of the offense,

22   and therefore the facts as stated in the presentence report

23   will be my findings of fact for the purpose of this

24   sentencing.

25     Now, with regard to the guidelines, the presentence report

lays out the probation office's calculation of the advisory

guideline range that applies here.  This calculation was

done using the 2021 guidelines manual and as follows:

Beginning with the guidelines offense level, the applicable

guideline in this case is U.S. Sentencing Guideline §2J1.2(a),

which has a base offense level of 14.

The government has also represented that Ms. Priola's

conduct resulted in substantial interference with the

administration of justice including the unnecessary

expenditure of substantial governmental resources.  As a

result, the offense level is increased by three, to 17,

per guidelines §2J1.2(b)(2).

The government has also represented that Ms. Priola has

demonstrated acceptance of responsibility in a manner that

entitles her to a two-level reduction under §3E1.1(a) and

that Ms. Priola assisted authorities in the investigation

and prosecution of this matter in a manner that entitles her

to an additional one-level reduction under §3E1.1(b).

Therefore, before I consider any departures or variances,

Ms. Priola's total offense level is 14.

Are there any objections to this calculation of the offense

level, Ms. Zimmerman?

MS. ZIMMERMAN:  No, Your Honor.

THE COURT:  Mr. Langmack?

MR. LANGMACK:  No, Your Honor.

1              THE COURT:  Okay.  Turning to the applicable criminal

2     history category, the presentence investigation report has

3     found that Ms. Priola has zero prior convictions that receive

4     criminal history points in the guidelines manual and that this

5     therefore gives her a criminal history point subtotal of zero,

6     which puts her in criminal history category I.

7         Is there any objection to that calculation, Ms. Zimmerman?

8              MS. ZIMMERMAN:  No, Your Honor.

9              THE COURT:  Mr. Langmack?

10             MR. LANGMACK:  No, Your Honor.

11             THE COURT:  Based on the offense level and criminal

12    history category I've just discussed, the presentence report --

13    and I agree with the calculation in this case.  The presentence

14    report calculates the guidelines sentencing range to be 15

15    months to 21 months of imprisonment.

16        Having determined the applicable guidelines range, the next

17    step is for me to consider departures.  The presentence report

18    does not include any departure grounds, and under the terms of

19    the plea agreement, both parties have agreed that there are no

20    grounds for imposing a sentence outside of the guidelines

21    range that is based on the policy statements in the guidelines

22    manual.

23        Is that correct, Ms. Zimmerman?

24             MS. ZIMMERMAN:  Yes, Your Honor.

25             THE COURT:  Mr. Langmack?

1          MR. LANGMACK:  Yes, Your Honor.

2          THE COURT:  Now, Section 3553 requires me to consider

3     a variety of factors, including the sentencing range the

4     guidelines prescribe, which I've just discussed, and also

5     the applicable penal statute.  The charge of Obstruction of

6     an Official Proceeding, in violation of 18 U.S.C. §1512(c)(2),

7     to which Ms. Priola has pleaded guilty, carries a statutory

8     maximum penalty of 20 years in prison.

9          The statute provides that Ms. Priola is eligible for not

10    less than one nor more than three years of probation because

11    the offense is a Class C felony.  Under the guidelines,

12    Ms. Priola is ineligible for probation.

13         If a term of imprisonment is imposed, the statutes provide

14    that Ms. Priola faces a supervised release range following

15    imprisonment of not more than three years, while under the

16    guidelines that range is one to three years.

17         The statute of conviction sets a maximum fine of up to

18    $250,000, while the guidelines fine range is between $7,500

19    and $75,000.  A special assessment of $100 per count is

20    mandatory.

21         And I believe as part of Ms. Priola's plea agreement

22    with the government, she has agreed to pay restitution to

23    the Architect of the Capitol -- just a minute.

24         Ms. Zimmerman, what's the amount of restitution?

25         MS. ZIMMERMAN:  It's $2,000, Your Honor.

1          THE COURT:  2,000?  Okay.  I was looking in the plea

2    agreement, and I think it's earlier up.  Let me just check.

3    Hold on.

4          MS. ZIMMERMAN:  Maybe paragraph 9?  10?

5          THE COURT:  Went right by that one.

6      No, paragraph 9 is conditions of release.  You know what,

7    I'm trying to -- usually it's in here.  Ah, wait.  No.  Yeah,

8    it's usually in paragraph 1.  In addition, your client agrees

9    to pay a special assessment of $100 per felony conviction.

10   And then it goes to the fact that I may impose a fine that is

11   sufficient to pay the federal government cost of imprisonment,

12   but there's nothing in here about the restitution amount,

13   which is always in the plea agreement.

14         MS. ZIMMERMAN:  I'm certain it is, Your Honor, but --

15         THE COURT:  Me too.  I thought so.  I believe --

16     Mr. Langmack, correct me if I'm wrong; I believe I went

17   over it in the plea.

18         MR. LANGMACK:  Yes, you did, Your Honor.

19         THE COURT:  All right.

20     (Law clerk conferring with Court.)

21     See?  My bright law clerk, who has just started, by

22   the way, has already found it.  Paragraph 13.

23     Thank you, Ms. Rutherford.

24     Okay.  Here we go, under Restitution.  Okay.  And you've

25   agreed, Ms. Priola, to pay $2,000.  It says in paragraph 13

1    of your plea agreement, $2,000 in restitution.  Okay.

2        Have I stated accurately the statutory and guidelines

3    framework under which we're operating, Ms. Zimmerman?

4            MS. ZIMMERMAN:  Yes, Your Honor.

5            THE COURT:  Mr. Langmack?

6            MR. LANGMACK:  Yes, Your Honor.

7            THE COURT:  Okay.  Before I discuss the other

8    sentencing factors that will bear on my final decision, I

9    will tell the parties in open court, although you should have

10   received the probation office's sentencing recommendation that

11   the probation office has recommended, taking into account the

12   guidelines range, the available sentences and all of the

13   factors in § 3553(a).

14       The probation office's recommendation, which is not binding

15   on me, is for 15 months of incarceration, 1 year of supervised

16   release, and 40 hours of community service within 12 months.

17   The recommendation of the probation office is not based on any

18   facts or circumstances that have not already been revealed to

19   the parties in the presentence report.

20       So, at this point, I'm going to give the parties an

21   opportunity to address the Court.  First, Ms. Zimmerman?

22           MS. ZIMMERMAN:  Yes, Your Honor.  I'm going to go to

23   the podium --

24           THE COURT:  Yes, that's fine.

25           MS. ZIMMERMAN:  -- and take my computer.

As this Court is familiar with the details of the attack on the U.S. Capitol that took place on January 6, 2021, I won't spend my time on those here.  Rather, I would like to focus my attention on the conduct of one particular rioter whose actions, like all those of other rioters, contributed directly and indirectly to the chaos and violence that day.  That rioter is the defendant, Christine Priola.

Defendant chose to participate in a violent, unruly mob of rioters that ultimately breached the Capitol on the east side. She could have chosen differently.  She could have left the restricted area or not even entered the restricted the area or the building as some other participants did, as her friends appear to have done.

Instead, defendant chose to stay and join the other rioters in attempting to breach the Capitol.  In doing so, defendant obstructed an official proceeding, that is, the certification of the 2020 Electoral College vote count.

For this conduct, the government recommends that the Court sentence the defendant to 18 months in prison, which is in the middle of the applicable guidelines range.

As we've discussed, I would like to play seven video clips which the government feels are the best evidence of the defendant's conduct that day.  The clips total about ten minutes.  Each was an exhibit to the government's sentencing memorandum.  Before I play each clip, I'll just

1    preview a little bit about what each clip shows.

2       Government's Exhibit 1 is approximately 26 seconds.

3    It shows the rioters behind the barricades on the east side

4    of the Capitol, and Ms. Priola's sign is visible around the

5    9-second mark.

6       (Video played.)

7       Government's Exhibit 2 is approximately 1 minute and 23

8    seconds long.  It shows the crowd outside the East Rotunda

9    or Columbus doors before the breach of that entrance.  Again,

10   Ms. Priola's sign is visible at around the 5-second to 10-second

11   mark, and again around the 1-minute mark, with Priola herself

12   visible around 1:15.  And just for the Court's awareness, the

13   sign is that -- on one side it says "We The People Take Back Our

14   Country."  On the other side, it's "The Children Cry Out for

15   Justice."

16      (Video played.)

17      I should have mentioned, Your Honor, all these videos were

18   taken by other defendants who were there that day, or other

19   rioters, not by the defendant herself.

20      Government's Exhibit 3 is approximately three minutes long.

21   It shows the crowd outside the East Rotunda doors getting more

22   and more agitated.  Ms. Priola's sign is visible around the

23   36-second mark.  The doors are forced open around the 45-second

24   mark.  The crowd is shown pushing against the police officer in

25   riot gear around 1:00 to 1:30.

1    The rioters are shown inside the building around 1:52.

2    These are the rioters coming from outside.  There are also

3    rioters coming from the inside the building at this time.

4    They've come from the other side of the building.

5    Priola's voice and then her person is on the camera starting

6    around 2:12 as she gives the name "Christine Blaze" as her name

7    around 2:25, and then she heads down the corridor and is visible

8    for the rest of this video.

9    (Video played.)

10   Government's Exhibit 4 is approximately 26 seconds long.

11   It shows the rioters forcing the doors open -- again, the

12   East Rotunda doors -- and Ms. Priola's sign is visible around

13   the 15-second mark.

14   (Video played.)

15   Government's Exhibit 5 is approximately two and a half

16   minutes long.  It shows the breach of the East Rotunda doors

17   from the view inside the building.  The rioters confront a

18   police officer around 1:10.  Ms. Priola's sign can be seen

19   around 2:15 to 2:30, after she has entered the building, and

20   then you can see her heading up the stairs.

21   (Video played.)

22   Government's Exhibit 7 is approximately 1 minute and

23   28 seconds long.  It shows the rioters, including Ms. Priola,

24   heading down the corridor.  Ms. Priola climbs onto a window

25   sill and displays her sign and knocks the window around the

1    45-second mark, and then it shows some other rioters entering

2    the Senate Gallery.

3         THE COURT:  There's no Exhibit 6.  Is that right?

4         MS. ZIMMERMAN:  No.  That was a mistake, Your Honor.

5         THE COURT:  Okay.

6       (Video played.)

7         MS. ZIMMERMAN:  The last exhibit is Government's

8    Exhibit 8, which is approximately 14 seconds long.  It shows

9    rioters on the Senate Chamber floor, including Ms. Priola, and

10   she's visible on a phone urging an associate to come inside,

11   visible and audible.  (Video played.)

12      Does the Court have any questions about any of the videos?

13        THE COURT:  No.  Thank you.

14        MS. ZIMMERMAN:  I'd like to address the 18 U.S.C.

15   3553(a) factors.  First, there is nature and circumstances of

16   the offense.

17      The nature and circumstances of defendant's crimes weigh

18   in favor of a sentence that is in the middle of the guideline

19   range.  Ms. Priola entered the Capitol building within minutes

20   of when the rioters had first breached the east side of the

21   Capitol and about 20 minutes after the members of the House

22   and Senate and the vice president had evacuated the building.

23   She carried a sign, not authorized to be in the building, that

24   made her intent to obstruct the vote certification clear:

25   "We the People Take Back Our Country."

1    Her presence on the Senate floor, including right next to

2    the dais as shown in the photo in the government's sentencing

3    memorandum, along with other rioters, forced the delay of the

4    certification of the vote.

5    Defendant was undeterred by the large, unruly mob of rioters;

6    she was undeterred by police officers, some of whom were in riot

7    gear; and she was undeterred by tear gas.

8    Defendant's actions on January 6 enabled other rioters to

9    continue their assault on the Capitol, to breach the building,

10   and engage in violence and destruction.

11   Ms. Priola also destroyed evidence by deleting data for

12   photos, text messages, chats, and videos from her cell phone

13   for the relevant time period.

14   And despite defendant's claims of having cooperated with

15   the government every step of the way, in fact she was not

16   cooperative.  She did not agree to an interview during the

17   search of her residence or during her arrest, which of course

18   was her right, but that's not the same as cooperation.  She

19   has not been interviewed by the FBI.  She did agree to be

20   interviewed in her plea agreement; we just haven't asked her

21   to be interviewed at this point.

22          THE COURT:  So she hasn't refused since the plea

23   agreement.

24          MS. ZIMMERMAN:  No, Your Honor.

25          THE COURT:  But on the day of the execution of the

1    search warrant, she refused to speak.

2            MS. ZIMMERMAN:  Yes.  She did give her phone password

3    to law enforcement during the execution of the search warrant,

4    but at that point she had already deleted data from her phone.

5        Additionally, the absence of violence or destructive riot

6    on Ms. Priola's part is not a mitigating factor here.  Had

7    she engaged in violence or destruction, she would be facing

8    additional charges and likely a higher guidelines range.

9        With respect to the history and characteristics of the

10   defendant, defendant has no criminal history.  She's well-

11   educated, having earned a master's degree, and is employed.

12       The need for the sentence imposed to reflect the

13   seriousness of the offense and promote respect for the

14   law also argues in favor of a guidelines sentence here

15   of 18 months.  The seriousness of this offense cannot be

16   overstated.

17       Defendant's actions, and those of other rioters that

18   day, showed no respect for law enforcement or police officers.

19   They showed no respect for Congress or the certification of

20   the vote.  They showed no respect for the Constitution and

21   the peaceful transfer of power.

22       A significant sentence is necessary to promote respect for

23   the law in this case.  The essence of the crime the defendant

24   pled guilty to, obstructing an official proceeding, is

25   disrespect for the law.

With respect to deterrence, as is noted in the government's sentencing memorandum, we're focused on general deterrence as well as specific deterrence.  For general deterrence, we would urge the Court to send a message to the public that these actions are taken seriously.

With respect to specific deterrence as to this defendant, while inside the Capitol, Ms. Priola was an enthusiastic participant in the activities, as can be seen in the videos. She showed no remorse immediately afterwards, she destroyed data from her cell phone, and she was not cooperative with law enforcement immediately after the events of the Capitol.

While we hope that the regret and remorse that she expresses now is sincere and genuine, it is hard to reconcile that remorse and regret with her actions in January of 2021.

In terms of avoiding unwarranted sentencing disparities, there aren't many analogous cases to compare to, but we did highlight four of them in our sentencing memorandum.

For defendants from the January 6 events who pled guilty and were sentenced to violations of 1512(c)(2), three of whom did enter the Senate floor, Paul Hodgkins was a very early plea and sentencing, in actually June of 2021.  And at the time of sentencing, he had performed more than 100 hours of community service.  I believe he was sentenced to eight months in prison.

Jacob Chansley was sentenced to 41 months.  His guideline

1    range was 41 to 51 months, so it was at the low end of that

2    range.

3        Christian Secor was recently sentenced to 42 months in

4    prison.  That was a significant upward variance from the

5    applicable guideline range of 12 to 18 months.

6        And Mr. Michetti was sentenced to nine months.  He never

7    entered the Senate Chamber, let alone the floor, and at the

8    time of sentencing, he was the sole supporter of his

9    four-year-old daughter and took some rehabilitative steps.

10       That defendant destroyed evidence, that she carried a sign

11   showing her intent, and that she entered the Senate Chamber

12   floor and approached the dais are all significant factors here

13   that we believe are distinguishable from some of those other

14   lower sentences.

15       In conclusion, the government recommends that the Court

16   sentence the defendant to 18 months in prison, in the middle

17   of the applicable guideline range, which we believe is

18   sufficient but not greater than necessary to reflect the

19   seriousness of her offense and yet recognize that, in fact,

20   she is pleading guilty and has acknowledged responsibility for

21   her crimes.  Unless the Court has questions, I'll submit.

22            THE COURT:  No.  Thank you, Ms. Zimmerman.

23            MS. ZIMMERMAN:  Thank you.

24            THE COURT:  Mr. Langmack?

25            MR. LANGMACK:  Thank you, Your Honor.

1          Well, we saw the videos, and you've read the sentencing

2     memorandum from both myself and Ms. Zimmerman and, as I

3     said, seen the exhibits.  We all know what happened that day.

4     It was a tragic event.  As I believe Ms. Zimmerman stated,

5     it's unprecedented -- in their memorandum, unprecedented in

6     this country and shocking when viewed as a whole and from a

7     bird's-eye view.  Nobody can contest that.

8          THE COURT:  Well, Mr. Langmack, I agree with you,

9     but there are still those in high office in this country who

10    maintain this was just, you know, visitors exercising their

11    First Amendment rights, and there are apparently a lot of

12    people who agree with them.  But I certainly agree with you.

13         MR. LANGMACK:  I do stand corrected in that, that

14    there are some people.  However, sitting here at this table,

15    we are able to look at that, as we just did again this

16    morning, and see these events, and these were just snippets.

17    There's a whole other half, and we've seen it in the news.

18         However, we want you to consider what Ms. Priola

19    specifically was involved in, and we saw some pieces of that

20    here.  And, Judge, based on that, and not as the event as a

21    whole, she did play a role in that.  And, yes, one person

22    might not make a difference, but if you take one and

23    everyone's out, then there is no event.  That is certainly

24    common sense and understood.

25         And this in no way is making an excuse or trying to

trivialize her presence there and the choices that she made
that day.  She will forever be sorry for this.  I know she's
expressed that to me a million times.  She's written a letter
to you.  You've read it.  It's posted.  That is her sincere
feelings.  This has altered her life immensely.

As Ms. Zimmerman was saying, the nature and circumstances
of the events, we know that.  As I just said, this was a
horrible day.

However, Ms. Priola, as for her criminal history, there is
none.  Obviously, that has to be taken into account.  It does.
Her criminal history doesn't raise the guideline level.  And
her characteristics, although on that day were not good, were
not positive, in her whole life that is a mere, minuscule
snippet of who she is as a person.

She's a good person.  She's a god-fearing woman.  She
means well for herself and other people around her.  Her life
has shown that as a whole, before and afterwards, and maybe
more afterwards in the recognition of what she did that day
and how it impacted the country, not just the United States
Capitol or the District of Columbia, but the country as a
whole.  We are divided enough, and this was a divisive point,
to put it mildly, in our country's history.  We would ask that
you consider the entirety of her character, Your Honor, and
not just that day.

As far as the other factor, the need for sentencing, there

1   certainly needs to be a sentence.  There have to be consequences.

2   There have to be repercussions.  Things like this have to go

3   challenged, or else what stops them from happening again?

4      In doing so, we ask that you consider what's the adequate

5   deterrence.  The general deterrence, we don't want people to

6   commit crimes.  That's why there are consequences.  That's why

7   we have jails.  That's why we have probation.  That's why we

8   have community service, engaging in classes, programs to teach

9   people what you did was wrong.  We understand that.

10     The specific deterrence for Ms. Priola -- obviously,

11  you will hand down a sentence today, but in my heart I know

12  Ms. Priola is never going to engage in anything even remotely

13  like this.  Matter of fact, I can't see her jaywalking,

14  littering.  This has had a profound effect on Ms. Priola -

15  profound - as it should.  That's what this whole process has

16  been.  This has altered her life forever.

17     To protect further crimes by Ms. Priola, I argue that's

18  been done.  I mean, regardless -- I'm not to say the sentence

19  doesn't matter, but before the sentencing, that's been done to

20  her.  This is not something that's going to happen -- this is

21  not something she's going to engage in, any criminal activity,

22  Your Honor.  We all know the kinds of sentences available.

23  We covered it in the presentence report and the guidelines.

24     We would ask, however, that the Court may consider a variance

25  downward for, once again, her minimal role in the entire event,

1    in no way excusing, trivializing this for her participation,
2    but just when we see and we know all the things that happened
3    that day, all the horrible things, people injured, both
4    physically and emotionally -- you don't have to be physically
5    touched to be injured -- this entire day caused irreparable
6    harm to many people, and that can never be forgotten.

7    But as far as Ms. Priola, thankfully, and as Ms. Zimmerman
8    said, she wasn't engaged in any violence.  She didn't attack
9    anybody.  She didn't break anything.  She didn't steal anything,
10   didn't vandalize.  Had she done that, she would have been
11   charged additionally.

12   But I think it can't be dismissed as it doesn't count towards
13   anything.  I think it does count towards her character, what she
14   actually did that day, and as I'm saying, what she didn't do
15   that day.  We think that plays a role in sentencing, Your Honor.
16   Despite her role, whether small or more, or what level of role
17   she played that day, this will never -- she'll forever be
18   associated with that event.

19   This is not something that after today you sentence her to
20   whatever, she does that, she does the probation, and then all
21   over, she's done her time.  This is something that will follow
22   her for the rest of her life.  Rightly or wrongly.  This is
23   something that will follow her for the rest of her life, and
24   her family.  This will never be in her past.  This will always
25   be in her present, in her psyche, in other peoples' psyche

1    thinking of her.

2        She has received death threats.  I've seen them.  Her family

3    has received threats.  It's unfortunate.  These are the times

4    we live in, that you do something wrong, someone else doesn't

5    like it, and they feel maybe they should take it into their own

6    hands.

7            THE COURT:  Yes.  We on this court are familiar with

8    those, too.

9            MR. LANGMACK:  Oh, absolutely.  I'm certain you are.

10        The one thing that I am sure of, as sure as I can be about

11    anything, is that Christine Priola will not be inside of a

12    courtroom, not sitting as a defendant, for rest of her life.

13    This is something I know.  I feel firmly in that, to the point

14    where I could make "beyond a reasonable doubt" type decisions,

15    Your Honor.  No one can know anything, but this is pretty darn

16    close.

17        I know she is eternally sorry, would wish that that day

18    had never happened, as we all do.  Would wish that she had

19    never been there, had never taken that next step, had never

20    gone in.  It's a tragic day in our history.  Ms. Priola has

21    taken full responsibility, owned everything that she did.

22    She wants to be a better person.  I feel she is now a better

23    person.

24        Unfortunately, for this event, she has realized how

25    something seemingly innocent at the time, without malice

1    of wishing to cause harm, can turn so quickly and get so

2    ugly in the blink of an eye; and once you're in it, sometimes

3    you can't see the forest for the trees until you step back a

4    little ways.  You're like, I can't believe it.

5        And, unfortunately, I think that's where we find ourselves

6    now.  So we would ask that you consider all these factors,

7    Your Honor, in coming to a sentence for Ms. Priola.

8    Thank you.

9        THE COURT:  Thank you.

10       Ms. Priola, I told you at your plea that at your sentencing

11   you would have a right to address the Court, and that is your

12   absolutely right; but you don't have to, and if you don't want

13   to, I am not going to hold it against you.  I've read all ten

14   pages of your letter.  It's very eloquent.  So it's totally

15   up to you, but is there anything you would like to say at this

16   time?

17       THE DEFENDANT:  I'd just have like a very short --

18       THE COURT:  Sure.  Just make sure you're at the

19   microphone.

20       THE DEFENDANT:  Thank you, Your Honor, for allowing

21   me to speak.  I don't have this part prepared.

22       But just watching those videos, that is so horrifying to

23   me.  So I can't even imagine what you all feel when you see

24   that, because it's magnified even more than what I feel.

25   Just horrifying.  And it's almost as if I don't even know

1     that person.

2        But for most of my adult life, I've tried to love God above

3     all else and my neighbor as myself, and that day I failed

4     miserably.  I want to live in a society where people respect

5     one another.  My actions that day were very uncivilized.  I

6     really messed up.

7        And I accept full blame and responsibility for everything

8     that the district attorney -- everything she says is correct.

9     I did everything.  I acted irrationally.  I didn't take time to

10    think about the consequences or how this would affect people or

11    the nation, and caused a lot of suffering and fear in people --

12    congressmen and woman inside the building and the law

13    enforcement and their families and my family.  It's just so

14    disheartening to know that I was part of that that caused such

15    pain and sorrow.

16       And our government has had to use so many resources to deal

17    with that day, and they should be -- their time should be given

18    to something else more important -- not more important, but

19    shouldn't have -- it could have been towards other things.

20       I would just like to sincerely apologize to everyone that

21    I've hurt and to every person in the United States, because each

22    one has been affected in some way.

23             THE COURT:  Let me ask you, Ms. Priola:  Your sign.

24    Who did you want to take the country back from?

25             THE DEFENDANT:  Just the allegations of corruption that

1    are in the news -- or were in the news.

2            THE COURT:  Corruption about what?  The election?

3            THE DEFENDANT:  Yeah.  But it was even before that.

4            THE COURT:  So who had the country, and who did you

5    want you to take it back from?

6            THE DEFENDANT:  I guess the -- I -- just the -- I guess

7    my perception of how things are run, that certain politicians

8    or groups have, like, taken over things that maybe weren't

9    supposed to be.  Like just --

10           THE COURT:  Do you feel the election was stolen?

11           THE DEFENDANT:  At the time, I did.

12           THE COURT:  What were you hoping to achieve by going

13   to the Capitol that day?

14           THE DEFENDANT:  Well, going to the Capitol that day,

15   I really was just there as like a rally.  And then I got

16   wrapped up in the emotions and the people around me and --

17   I did not plan absolutely to go into the building.

18           THE COURT:  The other side of your sign says something

19   about saving the children or thinking of the children.  What

20   would you mean by that?  What children?

21           THE DEFENDANT:  I know that President Trump had done a

22   lot of presidential orders or things about human trafficking,

23   and I was -- and into saving or protecting life from conception

24   to natural death.  And I just felt, I guess, at the time that

25   those would be reversed.

1          THE COURT:  So the reference to the children refers to

2     your feelings on abortion.  Is that correct?

3          THE DEFENDANT:  Well, not just abortion, but like the

4     human trafficking issue I don't think is a big enough --

5          THE COURT:  What human trafficking?  I mean what --

6     I'm actually very curious to find out.

7       What children did you believe were in danger?  Did you

8     believe there were children being held captive in the basement

9     of a restaurant on Connecticut Avenue?  That's a common belief.

10         THE DEFENDANT:  I don't know.

11         THE COURT:  I mean, what children are you referring to?

12         THE DEFENDANT:  I guess -- I guess it was that I felt

13    like he paid more attention, and I was afraid that maybe it

14    wouldn't be paid more attention to.  I don't know.

15         THE COURT:  Okay.  Continue.

16         THE DEFENDANT:  I've done a lot of soul-searching

17    this past year and a half, and I've learned that I have to

18    recognize and accept things that are not in my control.  And

19    I know that sounds simple or cliché, but sometimes it's hard,

20    and I work on that daily.  I've learned that my emotions

21    should not dictate my behavior and that I have to use right

22    judgment in making decisions.  And I just want to make amends

23    for what I have done in any way possible.

24       You know, I really want to live my life in support of a

25    world where we're not divided, where we respect one another

1    and love one another despite our differences.  I just -- I

2    want to be a good example in the world of how to help families

3    not be divided and coworkers and friends not be divided and

4    our nation not be divided.  I just really want to try to do

5    that.  And whatever sentence you give me, I hope it just

6    brings justice and peace -- some peace to the people I have

7    hurt.  Thank you, Your Honor.

8         THE COURT:  Thank you, Ms. Priola.

9         After calculating the sentencing guidelines and any

10   applicable departures, and hearing the statements made by

11   counsel and Ms. Priola, I have to now -- I have the difficult

12   job, as I do in every case -- and it is a difficult one -- to

13   consider the relevant factors set out by Congress in 18 U.S.C.

14   § 3553(a), and ensure that I impose a sentence sufficient but

15   not greater than necessary to comply with the purpose was

16   sentencing.

17        The government has stated these purposes, and Mr. Langmack

18   has mentioned them.  I don't need to list them all again.  But

19   I've considered all the purposes of sentencing and the factors

20   that I have to consider, and I'll discuss some of them now.

21   Some of them weigh more heavily than others in this case, as

22   they do in every case.

23        We are now well familiar with the events of January 6.

24   We have had, by my last count, close to 900 prosecutions,

25   all brought in this court.  This is a small court.  All the

1     judges are taking their fair share of these cases, myself

2     included; and every case presents a different defendant and

3     a different situation, and I know I and my other colleagues

4     endeavor to treat each defendant as an individual and not as

5     part of a mob.  But we have to be mindful of what happened

6     that day.

7         Every single time that I see videotape or hear recordings

8     of what happened that day, I am struck anew with both the

9     horror of what was going on that day and how close we came --

10    how close we came to not fulfilling one of the basic functions

11    of our democracy, which is a peaceful transfer of power, which

12    we lecture other governments all over the world on and we're

13    supposed to be an example of, and we were not that day.

14        And so while Mr. Langmack is correct in that your

15    background didn't involve any criminal activity, the events

16    of that day and the seriousness of those events cannot be

17    understated.  This was nothing less than an attempt to

18    violently overthrow the government, the legally, lawfully,

19    peacefully elected government by individuals who were mad

20    that their guy lost.

21        I see the videotapes.  I see the footage of the flags and

22    the signs that people were carrying and the hats they were

23    wearing and the garb.  And the people who mobbed that Capitol

24    were there in fealty, in loyalty, to one man -- not to the

25    Constitution, of which most of the people who come before me

1     seem woefully ignorant; not to the ideals of this country;

2     and not to the principles of democracy.  It's a blind loyalty

3     to one person who, by the way, remains free to this day.

4         There is no mob without the members of the mob, as I've

5     said before.  So Mr. Langmack made a point in his sentencing

6     memorandum, that if we were to take your participation out

7     of that group, that everything would have still happened;

8     your actions did not materially contribute.

9         But they did, because you were there.  And people act

10    in ways that they would never act alone when they're with

11    a group, or when they're with a mob, and when emotions are

12    involved.

13        But in terms of the seriousness of the offense and the

14    nature of the offense, it cannot be understated how serious

15    this was and how horrifying it was to the country and the fact

16    that the divisions that were already existing in this country

17    were worsened, that this country is more divided than ever,

18    and it was exacerbated by the actions of that day.

19        And you're one of the few defendants, Ms. Priola -- and

20    maybe it's because I have talked about it at every single

21    sentencing I've done -- to at least acknowledge the harm that

22    was done to the people there.

23        I hear a lot about rioters calling themselves and their

24    fellow protesters "patriots."  Nothing could be further from

25    the truth.  The people who stormed the Capitol that day were

not patriots.  They were petulant, angry individuals who
wanted back what they think they were entitled to.  And
that's why I asked you who did you think you were taking
back the country from.

The people who were working in that Capitol, the law
enforcement who were trying to defend the Capitol, the law
enforcement officers who rushed to the Capitol, they're the
patriots.  They're the ones who still have nightmares.
They're the ones who had to take early retirement from jobs
they loved.  They're the ones who are still nursing injuries.
They're the ones who thought they were going to die that day
as they were slipping in their own blood.

You didn't attack anyone, and for that reason the
government is not here asking for a significantly higher
sentence.

Yesterday, in this courthouse, we had a sentencing of an
individual who almost killed a police officer, who tricked him
into thinking that he was going to help him, and then threw
him to the mob.  That police officer almost died.

We have officers who have committed suicide.  We have ones
who still have suicidal ideation.  We have many individuals,
both law enforcement and individuals working in the Capitol
that day, who are still suffering from posttraumatic stress
disorder.  The damage continues.

Turning to your characteristics as an offender, it's true,

1    you've led a law-abiding life.  And I agree with Mr. Langmack.

2    I think there's very little likelihood that you're at a high

3    risk to offend.  But, you know, I get a lot of defendants in

4    January 6 cases who come in and talk about the fact that they've

5    live law-abiding lives, and they're loved by their communities,

6    they're loved by their families, and all of that may be true.

7        I get defendants in other cases, too.  I get defendants

8    in cases -- in drug cases, in nonviolent and violent cases.

9    They're loved by their families.  They're valued as fathers

10   and brothers and sons.  But they committed a crime, and that's

11   what I'm here to sentence you for.

12       I am certainly going to take into account the fact that

13   you have lived, up till now, a law-abiding life.  But

14   Ms. Zimmerman is right.  You know, your lawyer said, well, you

15   didn't hurt anybody.  You didn't take anything.  You didn't

16   steal anything, and that's why you're only facing 15 to 17

17   or whatever -- no, I'm sorry.  A range of -- let me get this

18   right.

19           MS. ZIMMERMAN:  15 to 21 months.

20           THE COURT:  15 to 21 months.  That's why.

21       Had you broken anything, had you laid a hand on a law

22   enforcement officer, you would be in a totally different

23   position.  So you've already gotten the benefit of having

24   no criminal history.

25       You've been allowed to live at home, to be on release,

1   to continue living your life, not to be detained, to be

2   brought here, to be respected with all the due process that

3   our system of government -- for which you apparently had very

4   little regard on January 6 -- has awarded, the Constitution

5   again, for which you seem to have very little understanding,

6   grants you.

7       So I am taking into consideration your characteristics as

8   an offender.  I know that you have a mother who you help and

9   a stepfather.  Your daughter wrote a lovely letter talking

10  about what a wonderful mother you are and how much she relies

11  on you.  And I read every page of your letter, and I take into

12  account that you have taken it upon yourself to start, in

13  small ways and large, to make amends for what you did.  I take

14  all of that into account.

15      But one of the other factors I need to take into account

16  is the need to avoid unwarranted disparity, and these are

17  difficult cases for that factor because they are so unusual.

18  I have done a lot of these sentencings, but I think you may

19  be the first to actually enter the Senate Chamber, and that's

20  significant.

21      There's a reason why the government emphasized that.

22  The Senate Chamber is sacrosanct.  It is where the transition

23  of power was to take place.  It is where our representatives

24  meet and debate.  And it was violated.  It was violated in the

25  most casual, crude, vulgar ways.  The whole Capitol was.

1    You're standing on a cabinet, waving your sign at a window,

2    at protesters outside, and all around you people are looting.

3    They're stealing stuff.  They're desecrating our Capitol.

4    And you seem to be enjoying yourself.  So that is not the person

5    your mother knows, that is not the person your daughter knows,

6    but that is who you were that day.

7    There has to be -- going back to sentence disparity, I have

8    endeavored, and I continue to endeavor, to sentence people in

9    accordance with their actions.  I have given some defendants a

10   lot more time; I've given some defendants a lot less time.  And

11   in your case, I'm considering both the fact that you were in an

12   early wave -- I see the videos.  You were right in there.

13   It's not like you wandered in after the Capitol had been

14   breached.  You were in there, pushing with a mob who's chanting

15   the name of the former president, who's tearing things up and

16   knocking on doors.  Can you imagine if there was anybody inside

17   those offices, how they felt hearing the yelling and the knocking

18   on the doors and wondering if they were going to be killed?

19   I have given sentences of a few days, and I've given sentences

20   of several years.  And I think the sentencing range in this case

21   is in line with what you did because you destroyed evidence

22   after this was over.

23   During the last five fiscal years, there were 47 offenders

24   whose primary guideline was 2J1.2 with a final offense level

25   of 14 and a criminal history category of I after excluding

1    offenders who received a substantial-assistance departure.

2    For the 34 offenders who received a sentence of imprisonment

3    in whole or in part, the average length of imprisonment imposed

4    was 13 months, and the median length of imprisonment was 12.

5    Those are not these cases, mostly, but I do believe that a

6    sentence within the guideline range is appropriate given your

7    actions in this case.

8    One of the things your lawyer talked about was your remorse,

9    and I believe your remorse today is sincere.  I do believe that.

10   I think you are sincere in your regret, and I do believe you are

11   sincere in your remorse, which is, frankly, more than I've seen

12   in some other defendants who have come before me.

13   But I wonder, as I do every time I sentence a defendant in

14   one of these cases, whether their remorse and regret come from

15   an independent realization of the nature of your actions, or

16   getting caught.

17   Because the person I see on the videotape is jubilant,

18   excited, happy to be there, encouraging other people to join

19   them, waving her flag through the windows.  Excited.  I'll wager

20   that nobody in that group thought they'd be looking at jail

21   time, and you certainly didn't.  But the point is, when you left

22   the Capitol that day and went home, did you feel remorse right

23   after for what you did?  I don't think so.

24   I think the remorse came when the publicity came and the

25   threats came and the recriminations came and you had to lose

your job, and protesters came and you realized that there are a lot of people who didn't agree with what you did. And then you realized that people were being sent to jail and that you were looking at a criminal charge, and that's why you deleted that material off your phone.

Did the regret come before you deleted the material? After the police officers came to execute a search warrant? I don't know. I'm sure it came shortly afterwards. But I'm wondering if you would be feeling this regret if you hadn't been charged with a crime. I don't know. I believe you do feel regret now, and I'm taking that into account.

The fact that you didn't cooperate or talk to the police when they came to execute the search warrant, that's your right. It is your right. But it does show me whether you were truly remorseful at that time. And the fact that you destroyed all the evidence on your cell phone of your participation leads me to wonder what you were destroying, what it is on your phone that you didn't want authorities to see.

Having considered all the factors, I believe that a sentence within the guideline range is a sentence that is sufficient but not greater than necessary to ensure all the factors enumerated in § 3553(a). I do not believe this is a case that warrants variance or departure. I have done plenty of both in the past, but this is not such a case. This is not the offense that warrants a departure.

1    I believe that Ms. Priola has gotten the benefit of her

2    bargain with the government.  I believe the guidelines range

3    in this case is appropriate.  Therefore, based on my

4    consideration of all the 3553(a) factors, I'll now state

5    the sentence to be imposed.

6        Can you stand with your lawyer.

7        (Defendant and counsel comply.)

8        It is the judgment of the Court that you, Christine Priola,

9    are hereby sentenced to the custody of the Bureau of Prisons

10   for a term of 15 months on Count 1.

11       You're further sentenced to serve 12 months of supervised

12   release and to pay $100 special assessment in addition to the

13   $2,000 restitution you've already agreed to pay as part of your

14   plea agreement.

15       I will note that I was considering the 18 months that the

16   government requested, but I eventually agreed that the sentence

17   recommended by the probation department is the appropriate one

18   here because of your genuine remorse -- well, your remorse that

19   I think is genuine -- because of the fact that you have appeared

20   to appreciate the consequences of your actions and that you have

21   already started to take steps, as I said, small and large, to

22   make amends.

23       The Court finds that you do not have the ability to pay a

24   fine and therefore waives imposition of a fine in this case,

25   and the Court waives any interest.

1    A special assessment of $100 is immediately payable to the

2    Clerk of the Court for the U.S. District Court of the District

3    of Columbia.  Within 30 days of any change of address, you shall

4    notify the Clerk of the Court of the change until such time as

5    the financial obligation is paid in full.

6    Mr. Langmack, do you have any recommendation for a facility?

7        MR. LANGMACK:  Yes.  Alderson in West Virginia,

8    Your Honor?

9        THE COURT:  Alderson?

10       MR. LANGMACK:  Correct.

11       THE COURT:  All right.

12    Now, Ms. Priola, the Bureau of Prisons does not answer

13    to me.  The judges of this court do not have any control over

14    the Federal Bureau of Prisons.  I wish we did, but we don't.

15    But I can make a recommendation, and I will recommend that

16    you serve your sentence at Alderson, which I believe is a

17    women's facility in West Virginia, which should keep you

18    relatively close to home as well.

19    I don't have any special conditions, but I will impose

20    upon you the mandatory release conditions for your supervised

21    release, and I have to set them out in open court.

22    While on supervised release, you must abide by the

23    following mandatory conditions:

24    You must not commit another federal, state, or local crime.

25    You must not unlawfully possess a controlled substance.

I'm not going to impose drug testing as a condition of release
because I don't believe there's anything in the record to
indicate that you're in need of substance-abuse treatment or
drug testing.

You must pay the special assessment imposed in accordance
with 18 U.S.C. § 3013.  You must pay the amount of restitution
as specified in your plea agreement.  You must notify the court
of any material change in your economic circumstances that might
affect your ability to pay restitution, fines, or special
assessments.

The Court will impose the standard conditions of supervised
release.  These 13 conditions, which will also be written out
on your judgment, are as follows:

1.  You must report to the probation office in the federal
judicial district where you're authorized to reside within 72
hours of your release from imprisonment unless the probation
officer instructs you to report to a different office or within
a different time frame.

2.  After initially reporting to the probation office, you
will receive instructions from the court or the officer about
how and when you must report, and you must report as instructed.

3.  You must not knowingly leave the federal judicial
district where you're authorized to reside without first getting
permission from the court or the probation officer.

4.  You must answer truthfully the questions asked by your

probation officer.

    5.  You must live at a place approved by your probation officer.  If you plan to change your residence or anything about your living arrangements, you must notify the probation officer at least 10 days before the change, and if that is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of being aware of a change.

    6.  You must allow the probation officer to visit you at any time, at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that they observe in plain view.

    7.  You must work full time, at least 30 hours per week, in lawful employment unless the probation officer excuses you from doing so.  If you do not have full-time employment, you must try to find such employment unless the probation officer excuses you from doing so.  If you plan to change your employment or the terms of your employment, you must notify the probation officer at least 10 day before the change, or if that is not possible due to unanticipated circumstances, within 72 hours of becoming aware of the change.

    8.  You must not communicate or interact with anyone you know who's engaged in criminal activity, and if you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.   If you are arrested or questioned by law enforcement, you must notify the probation officer within 72 hours.

10.   You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon.  That is anything that was designed or was modified for the specific purpose of causing bodily injury or death to another person.

11.   You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without getting permission of the court.

12.   If the probation officer determines that you pose a risk to another person or organization, the probation officer may require you to notify the person about the risk, and you must comply with that instruction.  The probation officer may contact the person or organization and confirm that they have been notified about the risk.

13.   You must follow the instructions of the probation officer related to the conditions of supervision.

Any objection to the conditions of supervised release that I've imposed, Ms. Zimmerman?

            MS. ZIMMERMAN:  No, Your Honor.

            THE COURT:  Mr. Langmack?

            MR. LANGMACK:  No, Your Honor.

            THE COURT:  All right.

The probation office shall release the presentence investigation report to all appropriate agencies in order to

1    execute the sentence of the court.  Treatment agencies shall

2    return the presentence report to the probation office upon

3    Ms. Priola's completion or termination from treatment.

4         Ms. Priola, pursuant to 18 U.S.C. § 3742, you have a right

5    to appeal the sentence imposed by the court subject to certain

6    rights of appeal that you waived as part of your plea agreement.

7    If you choose to appeal, you must file an appeal within 14

8    days after I enter judgment, and if you are unable to afford

9    the cost of an appeal, you may request permission from the

10   court to file an appeal without cost to you.

11        Now, the final issue for me to decide is whether I will

12   allow Ms. Priola to voluntarily surrender.  And I understand,

13   Ms. Zimmerman, you have no objection to her voluntary

14   surrender?

15             MS. ZIMMERMAN:  No, Your Honor, we don't.

16             THE COURT:  I think I told you, Ms. Priola, when you

17   took this plea and when you were first -- I think that's when

18   you first came before me, frankly.  It was the first time,

19   maybe an arraignment, but the -- I think the first time was

20   the plea.

21             MR. LANGMACK:  Just the plea.

22             THE COURT:  I told you that your compliance with

23   your conditions of release would be important, and they're

24   important today because, because you have complied with your

25   release conditions, because you have no previous criminal

1    history, I am going to allow you to remain on release pending

2    your voluntary surrender, which will be arranged between your

3    lawyer and the probation office.

4        I must caution you, though, that now having been sentenced,

5    not only do you have to continue to comply with your conditions

6    of release, you need to understand that should you violate any

7    of the conditions of your release, an arrest warrant may issue,

8    and you may be detained for failing to comply with the

9    conditions of release.

10       Even more importantly, if you don't show up for your

11   voluntary surrender, you could be charged with a separate

12   offense in violation of 18 U.S.C. § 3146(a)(2), and you could

13   be charged with a separate offense for which you could be

14   sentenced to up to 10 years in prison consecutive to any

15   sentence in this case.  And if you commit an additional crime

16   while on release pending voluntary surrender, you could be

17   subject to enhanced penalties.

18       So, basically, just continue to comply with the terms of

19   your pretrial release and surrender on the date as ordered to

20   by the probation office that your lawyer will inform you of.

21   Do you understand?

22            THE DEFENDANT:  Yes, Your Honor.

23            THE COURT:  Ms. Priola, you said in your letter

24   something that I frequently tell defendants, so you beat me

25   to the punch.  But you said that you read somewhere that you

1   are not the worst decision you ever made.  And that is true.

2   And one of the people who says that is a person I admire,

3   named Bryan Stevenson, who wrote a book called *Just Mercy* that

4   I highly recommend.  He said you are not the worst thing you

5   have ever done.

6       And that is abundantly clear in your case.  You've lived a

7   productive, law-abiding life up until January 6, and I think

8   that your determination to continue living a law-abiding life

9   after this case is sincere.  And I agree with your lawyer that

10  there's a very slim chance that you'll ever be before me or

11  any other court again.

12      But there's something else, which is you have a daughter,

13  you have family members, you have friends; and one of the ways

14  you demonstrate your character is not just how you live your

15  life, it's how you behave after you've made a mistake, because

16  everyone makes mistakes, and you have made a big one and a

17  serious one.

18      But you have a long life ahead of you, and your daughter

19  and your friends and your family are going to watch to see how

20  you come back from this and how you live your life after this,

21  and I'm confident that you have the ability to go forward

22  after this case is over, after your sentence is over, and live

23  a productive life.

24      And I strongly encourage you to consider getting your

25  sources of information from a variety of places.  One of the

1   things I see here is that people behaved in ways that they're

2   ashamed of because they went down rabbit holes of information

3   that is not altogether accurate, and they were inflamed by

4   some of the things that they were reading and hearing on the

5   internet.

6       I suggest that you try and widen your source of information

7   and consider listening to other viewpoints and considering

8   respecting that other people who may not share your political

9   beliefs are also patriots and also love their country.  And

10   that is the way you heal the divisions in this country.

11       So, good luck to you, ma'am.

12       Oh, yes.  I believe Probation's going to ask about the

13   transfer?  Yes.  Sorry.

14           MS. ZIMMERMAN:  I have two motions, also, Your Honor.

15           THE COURT:  Oh, yes.  Let me do that first.

16       As part of the plea agreement, you move to dismiss the

17   remaining counts?

18           MS. ZIMMERMAN:  I move to dismiss the complaint.

19           THE COURT:  The complaint.

20           MS. ZIMMERMAN:  And also we are moving to make the

21   exhibits that we played here public.

22           THE COURT:  All right.  I assume there's no objection

23   to the motion to dismiss the complaint?

24           MR. LANGMACK:  No objection.

25           THE COURT:  This complaint will be dismissed.

1      With regard to the exhibits which were submitted as

2      exhibits to the sentencing memoranda?

3            MR. LANGMACK:  We would prefer they not be.  We object

4      to them being --

5            THE COURT:  All right.

6         The motion will be granted.  The exhibits will be admitted.

7            PROBATION OFFICER:  Your Honor --

8            THE COURT:  Please state your name for the record,

9      please.

10           PROBATION OFFICER:  Aidee Gavito with the probation

11     department, Your Honor.

12           THE COURT:  Thank you.

13           PROBATION OFFICER:  And with regards to the terms of

14     supervised release, is the Court considering transferring

15     supervision and jurisdiction, or only supervision?

16           THE COURT:  Only supervision.  So supervision of your

17     probation will be transferred to the district in which you

18     reside.  Is that the Northern District of Ohio?

19           PROBATION OFFICER:  Yes, Your Honor, Northern District

20     of Ohio.

21           THE COURT:  Northern District of Ohio.  Jurisdiction of

22     this case will remain with me.

23           PROBATION OFFICER:  Thank you, Your Honor.

24           THE COURT:  That means that if there is a violation

25     of your supervised release, which I hope there is not, it will

1    come to me.

2            MS. ZIMMERMAN:  Your Honor, I'm sorry.  I may have

3    misspoken.  We want to make the exhibits that were played

4    public.  We want to release them to the public.  That's the

5    motion.

6            THE COURT:  And Mr. Langmack objects.  I think I am

7    going to grant the motion, because they are of utmost interest

8    to the public.  They do not contain personal or medical

9    information, and they concern a matter of which the public is

10   certainly entitled to be aware and is of vital importance to

11   our country.  So the motion will be granted.

12       Thank you all.

13        (Proceedings adjourned at 11:28 a.m.)

\*  \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne